# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

ROBIN SANDERS,                  :  Civil Action No. 06-1406(NLH)
individually and on behalf      :
of her children                 :
ROLAND SANDERS, RACHELLE D.     :
BISHOP, and ROSLYN SANDERS,     :  **OPINION**
                                :
                                :
        Plaintiffs,             :
                                :
    v.                          :
                                :
MICHAEL ROSENBERG and           :
MARIE ROSENBERG,                :
                                :
        Defendant.              :
                                :

**APPEARANCES:**

Jeffrey H. Sutherland, Esquire
Jeffrey H. Sutherland, PC
Linwood Commons
2106 New Road
Suite E-5
Linwood, NJ 08221

        *Attorney for plaintiffs*

Michael Dolich, Esquire
Bennett, Bricklin & Saltzberg
1601 Market Street
16th Floor
Philadelphia, PA 19103

        *Attorney for defendants*

**HILLMAN**, District Judge

        This matter has come before the Court on defendants' motions

for summary judgment[1] on all claims in plaintiffs' complaint.

_____

        [1]Defendants filed two separate summary judgment motions, one
with regard to plaintiffs' breach of contract and New Jersey
Consumer Fraud Act claims (Counts II and III), and the other with

For the reasons expressed below, defendants' motions will be granted in part and denied in part.

<u>**BACKGROUND**</u>

This matter concerns plaintiffs' alleged injuries resulting from mold in the townhouse plaintiffs rented from defendants.  On August 4, 1998, plaintiff Robin Sanders entered into a lease with defendants, Michael and Marie Rosenberg, to rent their townhouse in Mays Landing, New Jersey.  Ms. Sanders lived there with her three children, Roland, who is a minor, and Roslyn and Rachelle, who are both adults.  Roslyn moved out in November 2003, and the other three moved out on January 27, 2004.

During their tenancy, plaintiffs claim that the townhouse suffered from multiple leaks, which caused mold to develop. Plaintiffs claim that they saw water stains when they moved into the townhouse, and first saw active leaks in March 1999. Plaintiffs asked defendants to repair the leaks, but even though defendants sometimes attempted to repair the leaks, the leaks persisted and mold developed.  Plaintiffs allege that this mold caused them repeated and continuous respiratory illnesses, sleep disorders, and other illnesses.  Plaintiffs began to see physicians about their illnesses in approximately October 2003.

In December 2003, Ms. Sanders hired Coastal Environmental

_____

regard to plaintiffs' negligence claim (Count I).  These two partial motions for summary judgment seek the resolution of all of plaintiffs' claims.

2

Compliance, LLC to conduct an indoor air quality and mold investigation.  A follow-up visit and testing on the property was conducted on January 26, 2004.  Plaintiffs left the property at the end of January 2004 because the defendants were going to sell it.

On December 29, 2005, plaintiffs filed a three-count complaint against defendants in New Jersey state court, alleging negligence, breach of contract, and violation of New Jersey's Consumer Fraud Act.  Defendants removed the case to this Court on March 24, 2006, and are now moving for summary judgment in their favor on the three claims against them.  Plaintiffs have opposed defendants' motions.

**DISCUSSION**

**A.   Jurisdiction**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

**B.   Summary Judgment Standard**

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor."  Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon

4

mere allegations, general denials, or vague statements.  <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001).

**C.   Analysis**

Defendants have moved for summary judgment on each of plaintiffs' three claims against them.  They will be addressed in turn.

### 1.   Plaintiffs' negligence claim

Plaintiffs allege that defendants were negligent in their repairs of the water leaks on the property, and that defendants' negligence in repairing the leaks caused mold, which then caused plaintiffs' health problems.  Defendants have moved for summary judgment on this claim because plaintiffs have not provided the required expert witness or evidence to prove the causation element of their claims.

A landlord is under a common-law duty to exercise reasonable care to guard against foreseeable dangers arising from the use of the landlord's premises.  <u>Ellis v. Caprice</u>, 233 A.2d 654, 658 (N.J. Super. Ct. App. Div. 1967), <u>cert. denied</u>, 235 A.2d 901 (N.J. 1967).  Where the landlord fails to do so and "such failure results in injury to the tenant or persons on the premises as members of his family . . ., ordinarily the landlord is liable for the injury."  <u>Coleman v. Steinberg</u>, 253 A.2d 167, 170 (N.J. 1969).  This duty, however, does not make the landlord an insurer for all injuries that occur to a resident or visitor of the

5

premises.  "Negligence in this context requires not only proof of
the condition which caused the injury but that the condition was
known or should have been known by the landlord prior to the
occurrence, so that he had an opportunity to correct it."  Dwyer
v. Skyline Apartments, Inc., 301 A.2d 463, 465 (N.J. Super. Ct.
App. Div. 1973), aff'd, 311 A.2d 1 (N.J. 1973).  Further, even
though the landlord has a particular duty to his tenants, in
order to state a claim for negligence based on mold exposure,
plaintiffs must prove (1) the existence of mold in the house, (2)
that they inhaled the mold, (3) they suffered injuries, and (4)
the mold was the cause of these injuries.  See Heller v. Shaw
Industries, Inc., 167 F.3d 146, 153 (3d Cir. 1999) (citing In re
Paoli R.R. Yard PCB Litig., 916 F.2d 829, 860 (3d Cir. 1990)).

     More specifically with regard to the causation element,
plaintiffs must prove both general and specific causation.  See
DeLuca v. Merrell Dow Pharmaceuticals, 911 F.2d 941, 958 (3d Cir.
1990).  General causation addresses whether the mold is capable
of causing the type of injuries alleged, while specific causation
addresses whether the mold more likely than not caused injuries
in this particular case.  Rutigliano v. Valley Business Forms,
929 F. Supp. 779, 783 (D.N.J. 1996), aff'd, Valley Business Forms
v. Graphic Fine Colors, Inc., 118 F.3d 1577 (3d Cir. 1997).

     Additionally, in cases concerning toxic torts such as mold
exposure, testimony of an expert is required, in particular with

6

regard to causation.  See Heller v. Shaw Industries, Inc., 167
F.3d 146, 153 (3d Cir. 1999) (stating that an expert was integral
to proving the causation element of plaintiff's negligence claim
alleging that volatile organic compounds emitted from her carpet
caused her illness).  Whether such expert testimony is admissible
is governed by Federal Civil Procedure Rule 702.  Rule 702
provides,

> If scientific, technical, or other specialized
> knowledge will assist the trier of fact to understand
> the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience,
> training, or education, may testify thereto in the form
> of an opinion or otherwise, if (1) the testimony is
> based upon sufficient facts or data, (2) the testimony
> is the product of reliable principles and methods, and
> (3) the witness has applied the principles and methods
> reliably to the facts of the case.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S.
579, 572 (1993), the Supreme Court analyzed Rule 702, and
instructed that a two-step analysis is to be used to assess the
admissibility of the proffered expert testimony on scientific
issues under Rule 702.  The expert testimony must be reliable, so
that it must be "scientific," meaning grounded in the methods and
procedures of science, and it must constitute "knowledge,"
meaning something more than subjective belief or unsupported
speculation.  Daubert, 509 U.S. at 590. Guideposts that the
court may consider in assessing the reliability of the proffered
expert testimony include, but are not limited to: (1) whether the

expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community.  Id. at 593-94; In re TMI Litig., 193 F.3d 613, 663-64 (3d Cir. 1999).  Ultimately, a court is required to act as a gatekeeper "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the practice of an expert in the relevant field."  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).

Here, it does not appear that defendants contest that they had a duty to plaintiffs to guard against foreseeable dangers arising from the use of the townhouse, that there was mold in the townhouse, or that they knew about the mold.  Defendants' challenge to plaintiffs' claims is that (1) plaintiffs have not provided the required expert to support their claims, and (2) plaintiffs' evidence is not sufficient to support either general or specific causation.

Plaintiffs do not dispute that cases concerning mold exposure require testimony of an expert.  (See Pl.'s Opp. at 8.) Plaintiffs, however, do not specifically identify who their expert is.  Rather, it appears that plaintiffs rely on the physicians who treated each of them to satisfy their expert

8

requirement.  Thus, to determine whether this is sufficient, the medical records for each plaintiff must be analyzed. Additionally, in reviewing the medical records for each plaintiff, the Court will also consider defendants' contention that this evidence does not establish either general or specific causation.

     a.  *Robin Sanders*

The evidence in the record with regard to plaintiff Robin Sanders includes three medical reports and a biography of Robert Coifman, M.D., who prepared two of the reports.

The first medical report was prepared by Dr. Coifman on February 2, 2004.  (Pl. Ex. C.)  On January 20, 2004, Ms. Sanders was seen by Dr. Coifman, who is certified by the American Board of Pediatrics and the American Board of Allergy & Immunology. Dr. Coifman reports that Ms. Sanders states that she suffers disability from fibromyalgia, cervical root neuropathy, a sore in her nose, snoring, and respiratory congestion.  Dr. Coifman reports that physical findings suggest an irritant problem up and down her throat.  He reports that she is being taught how to use skin moisture sealants for dry skin, and has asked her to return for a fiberoptic rhinopharyngoscopy, which offers direct inspection of "what appears to be a key anatomic focus of her symptoms and may also offer relief of sleep apnea without the need to wear hardware."  (Id.)  Dr. Coifman's diagnosis of Ms.

9

Sanders is: (1) chronic and recurrent rhinosinusitis, (2) chronic nasopharyngitis, (3) dermatitis, and (4) bronchitis with suspected asthma.

The second medical report was prepared on January 23, 2004 by Vijay Sankhla, M.D. at Community Radiology, P.A.  (Pl. Ex. E.) On January 22, 2004, Ms. Sanders received a CT scan without contrast of her chest.  Dr. Sankhla reports that the scan found mild inflammatory changes in the posterior aspect of both lower lung fields, and a slightly prominent vascular marking or small aneurysm from the adjacent vessel.  He also reports that the adrenal glands were not enlarged.

The third report was prepared on April 19, 2004 by Dr. Coifman.  On April 6, 2004, Ms. Sanders again saw Dr. Coifman. He reports that Ms. Sanders had returned to his office after completing skin tests, which showed "positive intradermal reactions to just about everything."  (Def. Ex. C.)  Her "positives" included dust mites, for which she is being taught environmental controls.  He reports that she "had moderate numbers of basophils in her nasal mucosa suggesting the presence of an ongoing respiratory allergy, making her a likely candidate to benefit from allergy shots."  (Id.)  He recommends that she continue with her efforts at weight loss, "as this will minimize her tendency to trap fluid in her lower extremities if she raises her head for acid control, reduce acid reflux, reduce respiratory

10

workload, reduce weight load on her arthritis, etc." (<u>Id.</u>)  He also recommended she follow-up with a pulmonologist for her abnormal CT scans.  His diagnosis is: (1) respiratory allergy, (2) asthma, (3) chronic nasopharyngitis, and (4) GERD.

These three reports are insufficient to prove Ms. Sanders' negligence claim that the mold found in the townhouse caused her injuries.  The fatal flaw of Ms. Sanders' proof is that nothing states that mold was the culprit.  Even if it was found that Dr. Coifman was qualified to make a causation determination--that is, under Rule 702, he has the "knowledge, skill, experience, training, or education," to "testify thereto in the form of an opinion"-- he did not make such a determination.  There is nothing in Dr. Coifman's reports that state that mold was, or even potentially could have been, the cause of her respiratory problems.[2]  Simply put, there is no evidence to demonstrate that the mold caused Ms. Sanders' alleged injuries.  Consequently, summary judgment must be entered in favor of defendants on Ms. Sanders' negligence claim.

### b.   *Roland Sanders*

To prove Roland Sanders' claim, plaintiffs have submitted

---

[2]The only reference to mold in Ms. Sanders' medical records was a recording by either a nurse or the doctor of Ms. Sanders' statement that she had "mold exposure from prior residence," and that she was in the process of moving.  (Pl. Ex. D.)  Ms. Sanders has not provided any evidence that Dr. Coifman considered Ms. Sanders' professed mold exposure to be the cause of her ailments.

three medical reports and the curriculum vitae of his allergist,
Lawrence A. Schwartz, D.O., who is certified by the American
Board of Allergy & Immunology.

Roland first saw Dr. Schwartz on January 20, 2004.  Dr.
Schwartz reports that for the past three to four months, Roland
has been experiencing recurrent difficulties with rhinitis,
asthma, and cough.  (Pl. Ex. B.)  Dr. Schwartz reports that
Roland had been living in a 20-year old townhouse for the past
five years, and that recent testing of the home revealed high
levels of aspergillus and penicillium mold in his bedroom.  Dr.
Schwartz reports that initial skin allergy testing was performed
and revealed "significant reactivity to tree pollen, aspergillus,
alternaria, curvularia and other mold spores."  Dr. Schwartz
concludes,

> I believe there is a significant allergic component
> which includes tree pollen and mold spores.  Certainly,
> RJ's reactivity level did show high degrees of
> sensitivities towards various different mold spores.
> Additionally, an aeroallergen evaluation also revealed
> very high counts of both the aspergillus and the
> penicillium mold spores.  Therefore, it is likely that
> RJ's high exposure to the mold spores in association
> with his high amount of IgE reactivity to those mold
> spores may have led to his rhinitis and his asthma
> symptoms.

(Id.)  The doctor notes that Roland is to be moving out of the
townhouse in the next several days, and states, "Certainly, I
suspect that his symptoms may improve significantly after moving

out of this environment." (Id.) The doctor further concludes,

> It should be well noted, however, that RJ also showed
> very significant reactivity to tree pollen and there
> may be other significant reactivities that may
> contribute to his overall symptoms.

(Id.) Dr. Schwartz reports that further allergy skin testing
should only be performed if his symptoms persist after moving out
of the townhouse.

Roland next saw Dr. Schwartz on May 5, 2004. Dr. Schwartz
reports that his mother felt that his symptoms may have been
related to significant mold exposures in the home environment,
but even though they moved out of the townhouse, Roland's
symptoms "have again worsened this spring." (Pl. Ex. B.) Dr.
Schwartz reports that Roland has been experiencing increasing
difficulties with clear nasal discharge, nasal congestion, itchy
watery red eyes and wheeze associated chest tightness and cough.
Dr. Schwartz reports that allergy skin testing was completed and
revealed "significant reactivity to ragweed, weed pollen, grass
pollen, house dust mite, cat dander, tree pollen and mold
spores." (Id.) Dr. Schwartz concludes,

> It continues to be my impression that RJ is a 9-year-
> old with allergic rhinitis versus chronic rhinitis and
> a history consistent with chronic asthma and allergic
> conjunctivitis. I believe there is a very significant
> allergic component [with] ragweed, weed pollen, grass
> pollen, house dust mite, tree pollen and mold spores.
> For the most part, RJ did show extreme reactivity to
> all allergens tested. It is very likely these various
> reactivities are contributing heavily to his recurrent

> symptoms. . . . It is likely that his symptoms may be partially due to some non-allergic factors such as change in temperature/humidity as well as recurrent infectious exposures.

(Id.)

On September 26, 2005, Roland again saw Dr. Schwartz.  Dr. Schwartz reports that Roland has been receiving immunotherapy since May 2004.  (Pl. Ex. B.)  He states that he is pleased with Roland's partial improvements, but laments that Roland was late with his last injection.  Dr. Schwartz reports that he reviewed and reinforced "avoidance measures for patient's identified allergic triggers which include weeds, grasses, trees, dust mites, cats, dogs, cockroaches, and mold."  (Id.)

The final medical record for Roland is for his January 5, 2006 visit to Dr. Schwartz.  (Pl. Ex. B.)  This report is a follow-up to his September 26, 2005 visit, and Dr. Schwartz reports that he is pleased with partial improvements with the immunotherapy, and recommends maintenance dosing.  Dr. Schwartz also reminds Roland to avoid his allergic triggers.

This evidence is insufficient to prove Roland's claim that the mold in the townhouse caused his injuries.  Accepting for the purposes of argument that Dr. Schwartz would qualify as a Rule 702 expert and that Dr. Schwartz's methods are acceptable under Rule 702, Dr. Schwartz's reports do not prove the causation element of Roland's negligence claim.  It is true that Dr.

14

Schwartz initially linked mold as a possible cause for Roland's symptoms.  Indeed, Dr. Schwartz was certain that if mold were the cause of Roland's ailments, his symptoms would be resolved once he moved out of the townhouse.  As Dr. Schwartz reported, however, Roland's symptoms did not improve after he left the residence.

It is also important to note that when Dr. Schwartz stated that mold was a potential cause of Roland's problems, he emphasized that Roland showed very significant reactivity to tree pollen, and surmised that there may be other significant reactivities that may contribute to his overall symptoms.  This prediction proved to be accurate, as evidenced by Roland's May 5, 2004 office visit, which showed that Roland showed extreme reactivity to all allergens tested.  As a result, part of Roland's treatment plan was avoidance measures for his identified allergic triggers, including weeds, grasses, trees, dust mites, cats, dogs, cockroaches, and mold.

In short, the primary problem with Roland's negligence claim is that his allergist never concluded that mold was more likely than not the cause of Roland's problems.  Even though the evidence shows that Roland is allergic to mold, the evidence also shows that Roland is allergic to many other things.  Further, the evidence fails to show that the particular mold in defendants' townhouse was the type that Roland was allergic to.  Thus,

15

regardless of any <u>Daubert</u> challenges to plaintiffs' expert testimony, Roland's claim fails simply because the evidence does not show that the mold found in the townhouse is of the type that caused his symptoms, or that the mold actually caused his symptoms.  Consequently, defendants are entitled to judgment in their favor on Roland's negligence claim.[3]

### c.  *Rachelle Bishop*

The only evidence to support Rachelle's negligence claim is two progress notes for her January 4 and 22, 2004 visits to Juan Bejaran, M.D. at Southern Jersey Family Medical Centers, Inc., and a February 5, 2006 report by Dr. Bejaran.  As summarized in Dr. Bejaran's report, Rachelle had been under Dr. Bejaran's care

---

[3]Plaintiffs argue that defendants' expert's review of Roland's medical records, the Coastal report, and his deposition testimony supports plaintiffs' claims that mold exposure can cause respiratory problems.  (Pl. Opp. at 9.)  Plaintiffs state, "Defendants' own expert acknowledges that based on the tested levels of mold in the subject property it is 'scientifically valid' that the Plaintiffs['] mold exposure could cause them medical ailments."  (<u>Id.</u>)  Even if defendants' expert did make such a conclusion, the fact that "mold exposure could cause" plaintiffs medical ailments is not evidence that the specific mold exposure did actually cause plaintiffs their specific medical ailments.

Additionally, in challenging plaintiffs' proposed expert testimony, defendants are not required to come forward with "scientific evidence" negating plaintiffs' claims.  Rather, defendants are entitled to point out deficiencies in plaintiffs' proof.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986) ("[T]he burden on the moving party may be discharged by 'showing'-that is pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case.").

since October 2003, and he had treated her for complaints of sore throat, nasal congestion, fever, headache and nasal discharge with blood.  (Def. Ex. B.)  Dr. Bejaran states, "She has explained that throughout the duration of her care her apartment [has] been treated for different funguses/mold.  It is probable that Ms. Bishop's chronic ailments could be as a result of her daily exposure to these funguses/mold."  (Id.)

In addition to Daubert challenges to Dr. Bejaran's qualifications as an expert, as well as challenges to his methodology in coming to his conclusion, the fatal flaw of Rachelle's negligence claim is the same as her mother's and brother's--her evidence is insufficient to prove that the mold found in the townhouse is of the type that caused her symptoms, or that the mold actually caused her symptoms.  One conclusory statement, from what appears to be a family doctor, that "it is probable" that Rachelle's ailments "could be" a result of her exposure mold, is not sufficient to support her claim that the mold in the townhouse before she moved out on January 27, 2004 caused her injury.  Consequently, summary judgment must be entered in defendants' favor on Rachelle Bishop's negligence claim.

### d.  *Rosalyn Sanders*

According to defendants, Rosalyn Sanders has refused to participate in discovery by failing to answer written

interrogatories or appear for her deposition.  Plaintiffs do not challenge this, and they do not provide any medical records for Rosalyn.  Because there is no proof to support Rosalyn's claim, defendants are entitled to judgment in their favor on her negligence claim.

### 2.   Plaintiffs' breach of contract claim

In their complaint, plaintiffs claim that defendants breached the express and implied warranty of habitability because of their failure to provide a safe residence.  Defendants argue that breach of the express warranty of habitability, which is essentially a breach of lease claim, is barred because plaintiffs are seeking tort damages.  Similarly, defendants contend that plaintiffs' breach of the implied warranty of habitability is barred because they are seeking pain and suffering, which are unavailable for a breach of implied warranty of habitability claim.  Plaintiffs counter that their express and implied warranty of habitability claims should not be barred because they are not seeking tort damages, but rather contract damages such as rent abatement.

In New Jersey, the breach of the express or implied warranty of habitability can constitute a tenant's defense to a landlord's claims against him, or a separate cause of action by a tenant against his landlord.  As explained by the New Jersey Supreme Court,

18

> [T]he covenant on the part of a tenant to pay rent, and
> the covenant-whether express or implied-on the part of
> a landlord to maintain the demised premises in a
> habitable condition are for all purposes mutually
> dependent.  Accordingly in an action by a landlord for
> unpaid rent a tenant may plead, by way of defense and
> set off, a breach by the landlord of his continuing
> obligation to maintain an adequate standard of
> habitability.  Furthermore a tenant may initiate an
> action against his landlord to recover either part or
> all of a deposit paid upon the execution and delivery
> of the lease or part or all of the rent thereafter paid
> during the term, where he alleges that the lessor has
> broken his covenant to maintain the premises in a
> habitable condition.

Berzito v. Gambino, 63 N.J. 460, 469-70 (N.J. 1973).

Here, plaintiffs have brought a claim against defendants to recover for rent they paid while defendants had broken their covenant to maintain the townhouse in a habitable condition.  A prerequisite to maintaining such a suit is that 1) the tenant gave the landlord positive and seasonable notice of the alleged defect, 2) the tenant requested its correction, and 3) the tenant allowed the landlord a reasonable period of time to effect the repair or replacement.  Id. at 22.

Additionally, not every defect or inconvenience will be deemed to constitute a breach of the covenant of habitability-- "the condition complained of must be such as truly to render the premises uninhabitable in the eyes of a reasonable person." Id. Factors to be considered in determining whether a residence is inhabitable are:

1. Has there been a violation of any applicable housing code or building or sanitary regulations? 2. Is the nature of the deficiency or defect such as to affect a vital facility? 3. What is its potential or actual effect upon safety and sanitation? 4. For what length of time has it persisted? 5. What is the age of the structure? 6. What is the amount of the rent? 7. Can the tenant be said to have waived the defect or be estopped to complain? 8. Was the tenant in any way responsible for the defective condition?

Id. This list is intended to be suggestive rather than exhaustive; and each case must be governed by its own facts.  Id. If the alleged breach on the part of the landlord is proven, the tenant will be charged only with the reasonable rental value of the property in its imperfect condition during his period of occupancy.  Id.

In their papers, neither party has substantively discussed whether defendants breached the express or implied warranty of habitability--that is, neither party has discussed whether plaintiffs have met the prerequisites for maintaining such a claim, and neither party has discussed whether the mold condition could be considered to make the premises uninhabitable in the eyes of a reasonable person.[4]  Furthermore, there is no evidence

---

[4]Defendants minimally address this issue in their reply brief, in which they argue that if plaintiffs are seeking rent reimbursement for constructive eviction, that claim would be unavailing.  (Def.'s Reply at 2.)  Defendants argue that plaintiffs waived any claim to rent reimbursement because the water problems allegedly began in March 2000, but plaintiffs did not move out until almost four years later, and they only moved out then because defendants were selling the townhouse.  (Id. at 3.)  Because defendants raised this argument in their reply,

presented to establish what would be the reasonable rental value
of the property if it is found to have been uninhabitable.  The
reasons that parties have not discussed these issues is because
defendants moved for summary judgment on the basis that
plaintiffs were seeking tort damages, rather than contract
damages.[5]  Now that plaintiffs have clarified that they are
seeking damages that are ostensibly available under Berzito,
defendants' argument is not availing.[6]  However, now that
discovery is closed, and the case is ripe for either trial or
summary disposition, defendants shall be afforded the opportunity
to file another motion for summary judgment on plaintiff's breach
of contract claim if they choose to.  Until then, defendants'

_____

plaintiffs did not have a chance to respond, however.
Consequently, this argument will be disregarded, and defendants
may raise this argument again if they choose to file another
motion for summary judgment.  See Bayer AG v. Schein
Pharmaceutical, Inc., 129 F. Supp. 2d 705, 716 (D.N.J. 2001).

    [5]It is important to note that a landlord does not have
absolute liability under the implied warranty of habitability for
injuries caused by a dangerous condition.  Ruiz ex rel. Ruiz v.
Kaprelian, 731 A.2d 118, 122 (N.J. Super. Ct. App. Div. 1999).

    [6]In their reply brief, defendants acknowledge that a tenant
has an independent cause of action for breach of the warranty of
habitability, but state that there cannot be "an after-the-fact
cause of action for rent abatement."  (Def.'s Reply at 2.)   It
appears that defendants are arguing that a tenant can file suit
against a landlord for recoupment of the rent paid above the
reasonable rental value while the tenant is still living in the
residence, but cannot do so after he has moved out.  The cases
cited by defendants do not necessarily support this proposition,
however.  Defendants are invited to further elaborate on this
position if they choose to renew their motion for summary
judgment on plaintiffs' breach of warranty of habitability claim.

motion for summary judgment will be denied without prejudice.

**3.   Plaintiffs' Consumer Fraud Act claim**

Plaintiffs also claim that defendants violated New Jersey's Consumer Fraud Act ("CFA").  Defendants argue that the CFA is inapplicable to situations that involve, as here, a single lease of a townhouse.  Defendants also argue that even if the CFA did apply, plaintiffs cannot prove their claim.

The CFA provides, "Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act . . . may bring an action . . . in any court of competent jurisdiction."  N.J.S.A. 56:8-19.  The elements of a CFA claim are: (1) unlawful conduct by the defendant; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendant's unlawful conduct and the plaintiff's ascertainable loss.  <u>Cox v. Sears Roebuck & Co.</u>, 647 A.2d 454, 462-63 (N.J. 1994).

The New Jersey Supreme Court in <u>Cox</u> explained what constitutes "unlawful conduct":

> To violate the Act, a person must commit an "unlawful practice" as defined in the legislation. Unlawful practices fall into three general categories: affirmative acts, knowing omissions, and regulation violations. The first two are found in the language of N.J.S.A. 56:8-2, and the third is based on regulations enacted under N.J.S.A. 56:8-4. A practice can be unlawful even if no person was in fact misled or

deceived thereby. The capacity to mislead is the prime
ingredient of all types of consumer fraud.

When the alleged consumer-fraud violation consists
of an affirmative act, intent is not an essential
element and the plaintiff need not prove that the
defendant intended to commit an unlawful act.  However,
when the alleged consumer fraud consists of an
omission, the plaintiff must show that the defendant
acted with knowledge, and intent *is* an essential
element of the fraud.

. . .

The third category of unlawful acts consists of
violations of specific regulations promulgated under
the Act. In those instances, intent is not an element
of the unlawful practice, and the regulations impose
strict liability for such violations. The parties
subject to the regulations are assumed to be familiar
with them, so that any  violation of the regulations,
regardless of intent or moral culpability, constitutes
a violation of the Act.

Id. (internal citations omitted).

Plaintiffs have alleged that defendants' "failure to respond
to the Plaintiffs' repeated complaints of leaks, water
infiltration and related mold" violated the CFA.  (Compl. ¶ 3.)
Thus, it appears that plaintiffs are alleging that defendants
violated the CFA by omission.  As stated above, a CFA violation
by omission requires a showing of intent.  In re National Credit
Management Group, L.L.C., 21 F. Supp. 2d 424, 449 (D.N.J. 1998)
(citing Cox, 647 A.2d at 462) (other citation omitted).  To prove
intent, a plaintiff must provide proof establishing that the
defendant acted knowingly, with intent that another rely on such
concealment, suppression, or omission.  Id.; see also Varacallo

23

v. Massachusetts Mut. Life Ins., 752 A.2d 807, 813 (N.J. Super.
Ct. App. Div. 2000) (stating that to allege a claim for an
omission pursuant to the CFA, the plaintiffs must allege that the
defendant, "concealed, suppressed or omitted a material fact,
knowingly and with intent that others rely on the omission").

Here, even assuming that the CFA is applicable in this case,
plaintiffs have failed to establish that defendants knowingly
concealed the existence of water leaks that eventually caused the
mold.  Plaintiffs admit that when they entered into the lease,
they were aware that the townhouse had leaks. (See Pl.'s
Statement of Facts ¶ 15 ("The Plaintiffs saw water stains on the
walls and ceiling that appeared from leaks when they moved into
the property in August, 1998. . . ."); see also Pl.'s Ex. J,
Robin Sanders Dep. at 23.)  Additionally, plaintiffs admit that
no new leaks appeared until seven months later. (See Pl.'s
Statement of Facts ¶ 15 ("The Plaintiffs . . . first saw active
leaks in March 1999."); see also Pl.'s Ex. J, Robin Sanders Dep.
at 25-26.)  Defendants, therefore, cannot be held to have
intended to deceive plaintiffs about the leaks when (1)
plaintiffs knew of the leaks prior to moving into the townhouse,
and (2) active leaks did not occur until seven months after they
moved in.  Further, although defendants may have failed to
respond to plaintiffs' complaints about the leaks as they allege,
that claim is a claim for breach of the implied warranty of

24

habitability, and not for a violation of the CFA.  Consequently, because there is no proof to support plaintiffs' CFA claim, defendants are entitled to summary judgment.

## CONCLUSION

For the reasons expressed above, defendants' motion for summary judgment is granted as to plaintiffs' negligence and CFA claims.  Summary judgment is denied without prejudice on plaintiffs' breach of the express and implied warranty of habitability claim.  Defendants may file a renewed motion for summary judgment on that claim within 30 days if they so choose.


Dated: Dated April 10, 2008        s/ Noel L. Hillman

At Camden, New Jersey              NOEL L. HILLMAN, U.S.D.J.